# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSIE B. RILEY, | CASE NO. 1:09-cv-00627-SMS |
| Plaintiff, | |
| v. | ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS |
| MICHAEL ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Josie B. Riley, proceeding *in forma pauperis*, by her attorney, Law Offices of Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI"), pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act"). The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1]  Following a review of the complete record and applicable law, this Court concludes that the ALJ properly found Plaintiff ineligible for benefits.

I.  **Administrative Record**

   A.  **Procedural History**

On January 5, 2007, Plaintiff filed protectively for supplementary security income, alleging disability beginning January 5, 2007. AR 15. Her claim was initially denied on April 6,

---

[1] Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 8 & 9).

1

2007, and upon reconsideration, on July 26, 2007.  AR 14.  On September 7, 2007, Plaintiff filed a timely request for a hearing.  AR 14.   Plaintiff appeared and testified at a hearing on July 23, 2008.  AR 309-351. On September 29, 2008, Administrative Law Judge Patricia Leary Flierl denied Plaintiff's application.  AR 15-22.  The Appeals Council denied review on February 9, 2009.  AR 4-6.  On April 8, 2009, Plaintiff filed a complaint seeking this Court's review (Doc. 1).

**B.    Factual Background**

Plaintiff Josie B. Riley (born January 9, 1960) contends that she became disabled in the course of a New Year's eve arrest for drunkenness and public disturbance.  AR 79, 128, 185.  Plaintiff told doctors at Community Medical Center that an officer slammed her into a wall in the course of her arrest.  AR 185.  She testified that she could not remember what happened.  AR 319.  When she was released on New Year's day, she called 911, complaining of neck pain and was taken to Community Medical Center, which diagnosed a fracture of her cervical spine.  AR 185, 319.

**Adult Disability Report.**  In an undated adult disability report (Form SSA-3368), Plaintiff claimed that she was unable to work as a result of migraines, blurred vision, stomach pain, and a cracked neck.  AR 72.  She testified that she was "in too much pain" to work, as a result of her cracked neck, shoulder problems, and leg problems.  AR 318-319.  Her cervical collar made her hardly able to move.  AR 319.  Her right leg goes to sleep.  AR 319-320.  Her left shoulder "has a pulling in it." AR 319-320.  Her right hand goes numb and she can hardly move it.  AR 320.  She has headaches, and depending on how she moves her neck, neck pain.  AR 320.  Plaintiff testified that she has pain three or four days out of seven.  AR 320.  When she feels the pain, she takes a pill and goes to sleep.  AR 320.  Her pain medications include Vicodin, Tramadol, and pink pills called metrosol.  AR 321.  She took pain pills whenever she needed them, and was uncertain of the exact schedule.  AR 321.

In January 2006, Plaintiff incurred a neck injury that left her unable to lift, twist her head, and bend, causing limited movement and shortness of breath.  AR 72.  She wore a neck brace.  AR 81, 89.  Her medications included prednisone, metoprolol (heart and blood pressure), loratidine (itching), enalapril (high blood pressure), tramadol (migraine headaches), nexium

(heartburn), baclofen (muscle relaxer), vicodin (pain in legs, neck, and back), and amitriptyline (depression). AR 112. Plaintiff has had no physical therapy, pain injections, or other treatment for her neck pain. AR 327.

Plaintiff last worked doing laundry at the Piccadilly Inn. AR 316, 341. She was laid off on December 24, 2003. AR 72. Plaintiff had worked longest as a hotel housekeeper, washing dishes, vacuuming, and performing general housekeeping duties. AR 73, 114. At some point in the distant past, Plaintiff had been a certified nursing assistant (CNA). AR 315. In or about 1998 or 1999, Plaintiff cared for children in her home through social services. AR 316-318.

**Initial hospitalization.** On January 1, 2007, Plaintiff was treated for multiple fractures of her C1 vertebra at the emergency room of Community Medical Center. AR 182-184, 186, 194. The radiologist's reports also noted additional spinal abnormalities including degenerative changes of the middle and lower cervical spine and reversal of the normal lordotic curve. AR 194, 195, 196. Plaintiff was admitted to the hospital. AR 185. Copies of lab test results are included at AR 188-193. Doctors prescribed pain killers, forbid Plaintiff to lift or bend, and directed her to wear a cervical collar at all times for three months. AR 182.

**University Medical Center.** Plaintiff's records from University Medical Center for January 8, 2007, through June 12, 2008, are handwritten and difficult to read. AR 168-181, 275-307. On January 8, 2007, Plaintiff was seen at a University Health Center clinic for a headache and neck pain resulting from an assault during her arrest on New Year's day. AR 180. Her neck was in a collar and was tender to touch. AR 180. Dr. Garcia diagnosed a C1 fracture and spinal stenosis, noting an urgent need for a referral to a neurosurgeon. AR 180. Plaintiff complained that her pain was 10/10 and was referred for a CT scan of her neck at a neurosurgery consultation on January 19, 2007. AR 179. At a clinic appointment on February 16, 2007, Plaintiff complained of neck and overall body pain. AR 178. Plaintiff missed a neurosurgery appointment on February 16, 2007, but saw Stefanescu on March 14, 2007, complaining of neck pain and requesting medication refills. AR 170. At a neurosurgery appointment on March 28, 2007, Plaintiff complained of pain with an intensity of 10/10. AR 175. Plaintiff missed all her appointments the week of April 13, 2007, including a neurosurgery appointment. AR 173. On

April 20, 2007, Plaintiff saw a clinic physician, complaining of neck pain and requesting prescription renewals. AR 173. On May 14, 2007, Dr. Stefanescu noted pain from the fractured cervical spine and referred Plaintiff for a neurosurgery consultation. AR 172. A review of the CT results of Plaintiff's cervical spine on June 22, 2007, indicated increased displacement of C2 vertebra compared to an earlier CT scan. AR 169. Her neurosurgeon directed that she wear the cervical collar an additional two months and return for another CT scan. AR 169. On July 2, 2007, Plaintiff was directed to continue wearing her cervical collar and return for follow-up appointments after four and six weeks. AR 168.

Plaintiff stopped wearing her collar in early August 2007 and was "asymptomatic" and "doing quite well" at an August 13, 2007, neurosurgery appointment. AR 306. The alignment of the C1 fracture had not changed since January 17, 2007. AR 306. Plaintiff was directed to continue wearing her collar. AR 306. Plaintiff continued to complain of neck pain until the last examination in the record, which is dated June 13, 2008. AR 275-305.

Although the family health center continued to prescribe vicodin (acetaminophen and hydrocodone) and Tramadol (a synthetic opioid analgesic) for pain (AR 279, 281, 283, 285, 287, 289, 293), the January 7, 2008 neurosurgery report states, "NO NARCOTICS–She was referred to pain clinic." AR 295. On June 13, 2008, Dr. Salazar questioned the possibility of "alcohol/substance/drug abuse." AR 284. Two undated, but apparently later, reports, at least one of which was prepared by the pain center, diagnose alcohol dependence and note, "[Patient] needs to stop drinking and get into recovery program." AR 275-278. After Plaintiff saw pain management specialist, Dr. Gazetta on June 12, 2008, she refused to see him again because he concluded that she was an alcoholic. AR 284, 323, 326.[2]

**Fresno Mental Health Center.** In January 2007, Plaintiff contacted Fresno County Mental Health for assistance with depression, insomnia, and helplessness. AR 130-132. Her initial comprehensive assessment noted that she had been injured at the time of her arrest in early January and had been assaulted by her boyfriend in October, who broke Plaintiff's teeth in the

---

[2] Plaintiff testified that she had not had alcohol since she was homeless from September 2006 until January 31, 2007. AR 323. She denied having had a drink between January 31, 2007, and the hearing date. AR 325-326.

4

attack. AR 123-124, 128. Her social worker diagnosed depression and alcohol dependence, noting her lack of social support, estrangement from her family, medical problems, and lack of income. AR 127. Her GAF was 35.[3] AR 127. Plaintiff had recently attempted to overdose using a friend's medications. AR 128. Ultimately, Plaintiff did not keep her appointment to be evaluated for medication and declined to attend an afternoon group therapy sessions. AR 119-120.

On February 20, 2007, Plaintiff's mental health nurse practitioner Wendy Brandon diagnosed depression, head, neck, and shoulder pain, ulcers, and alcoholism, aggravated by financial stressors. AR 269. Plaintiff's GAF was 55-60.[4] AR 269. Brandon noted that Plaintiff was "hurried and irritable, repeatedly responding to Brandon's questions with "It's in the chart already isn't it?" AR 270. Brandon described Plaintiff as goal-oriented and organized. AR 270. Plaintiff had taken Elavil (an antidepressant) for ten to fifteen years, ending in January. AR 271. Brandon prescribed Celexa, an antidepressant, noting that she would evaluate efficacy and tolerability at Plaintiff's next appointment. AR 269.

Plaintiff returned to Fresno County Mental Health on May 14, 2007, requesting a renewal of her Celexa prescription. AR 266. Plaintiff reported that she had not had alcohol in three months and had been out of Celexa for two months. AR 266. She was sleeping poorly whether or not she took Celexa. AR 266. She wore a cervical collar and complained that she had been denied general relief, although she was unable to work. AR 266. Plaintiff explained that she had

---

[3] The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of the diagnosis. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR"). It considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations." Id. at 34. The first description in the range indicates symptom severity; the second, level of functioning. Id. at 32. In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings. Id. at 33.
  GAF 35 is the mid-range of GAF 30-40, which indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." Id. at 34.

[4] GAF 55-60 is the upper half of the range GAF 51-60, which indicates "[[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id. at 34.

5

missed a prior appointment due to a death in her family. AR 266. Plaintiff's prescription was renewed, but she was referred to the medication clinic and another provider. AR 266.

**Adult Function Reports.** In an adult function report dated February 3, 2007, Plaintiff complained primarily of pain, noting that she spent most of her time trying to sleep to avoid pain. AR 83. Nonetheless, her pain often woke her. AR 84. She read the newspaper and walked but avoided television since the sound hurt her head. AR 83. She avoided noise and the presence of other people. AR 86. Plaintiff described herself as having always preferred television, movies, and snacking to social activities. AR 88.

Plaintiff was able to perform her own personal care. AR 84. She was able to cook for herself unless she lacked the strength. AR 85. She shopped once each month for three hours, taking the extra time to compare prices. AR 86. Plaintiff was able to pay bills and make change but did not have a savings or checking account. AR 86.

Plaintiff could walk about a block, then had to sit and rest for twenty minutes when her legs fell asleep. AR 88. She got along well with supervisors if they understood her but she had difficulty expressing herself. AR 89.

In a third-party adult function report, Plaintiff's friend Lee Guiton stated that she drove Plaintiff to the store and to doctors' appointments. AR 91. Guiton reported that since Plaintiff became disabled, she was no longer able to perform routine daily duties, including dressing, bathing, and caring for her hair. AR 92. Plaintiff prepared sandwiches, fruit, and beverages for herself daily. AR 93. She had limited movement. AR 93. According to Guiton, Plaintiff was able to handle money and shopped for groceries for an hour every two weeks. AR 94. Plaintiff went outside twice daily and was able to walk as well as ride in a car or use public transportation. AR 94. She spent time reading and talking on the phone. AR 95. Plaintiff was fully able to pay attention and completed the things that she started. AR 96. Plaintiff had difficulty lifting, squatting, bending, kneeling, and climbing stairs. AR 96. She related well to authority figures and changes in routine. AR 97.

Three other friends wrote short letters attesting to Plaintiff's disability. AR 115-117.

///

**Stefanescu opinion.**  Plaintiff's treating physician, Dr. Stefanescu, provided a general medical evaluation dated February 13, 2007.  AR 133-134.  His examination generally found Plaintiff's condition to be unremarkable except for a limited range of motion resulting from her cervical fracture.  AR 134.  Because of the cervical fracture, Stefanescu opined that Plaintiff could frequently lift twenty-five pounds and occasionally lift ten pounds [*sic*], could stand or walk less than two hours in an eight-hour work day, could sit six hours in an eight hour workday, needed to alternate sitting and standing, and could never climb, balance, stoop, kneel, crouch, or crawl.  AR 136.  Plaintiff could not work near heights or moving machinery.  AR 136.  According to Stefanescu, Plaintiff's prognosis was a "long recovery of [cervical] fracture after surgery."  AR 136.

**Stoltz consultative opinion.**  Dr. Steven Stoltz performed a consultative examination on behalf of the agency in March 2007.  AR 137-141.  Stoltz reported that after Plaintiff had cracked her neck while in jail in January 2007, her treating neurologist at University Medical Center had directed her to wear an Aspen collar until April 2007.  AR 187.  Plaintiff complained of constant pain in her neck, upper back and shoulders, and the occipital region of her head.  AR 187.  She reported no radiculopathy in her arms nor bowel or bladder incontinence.  AR 137.  Plaintiff had a history of psychiatric problems, hypertension, and migraine headaches.  AR 137.  Plaintiff would not remove her cervical collar so that Stoltz could examine her neck.  AR 139.  The cervical collar impaired her ability to bend forward.  AR 139.  Her upper chest was tender just below the collar.  AR 139.  The range of motion in all upper and lower extremities was within normal limits.  AR 139-140.  Stoltz found no functional limitations for walking, standing, or sitting.  AR 141.  Plaintiff was able to lift about ten pounds.  AR 141.  Because of the cervical collar, she could not work at heights or in positions that would require frequent neck movement.  AR 141.

**Swanson consultative opinion.**  On March 8, 2007, Dr. Stephen Swanson conducted a consultive psychological assessment for the agency.  AR 142-146.  Plaintiff was uncooperative and inebriated, having consumed alcohol before the evaluation.  AR 144.  Swanson noted that Plaintiff had begun drinking alcohol at the age of nine, reported drinking heavily on a daily basis, and described herself as an alcoholic.  AR 143.  Her movements were slow but within normal

limits. AR 144. Her speech was disjointed. AR 144. Swanson observed no signs of delusion, perceptual disorder, psychotic process, or suicidal or homicidal ideation. AR 144. Her memory, judgment and insight were intact. AR 144. Although testing indicated low normal intelligence, Swanson commented that Plaintiff had not made appropriate effort on the test. AR 145. Plaintiff was also not motivated to perform well on tests of memory and visual, conceptual, and visuo-motor tracking. AR 145. Swanson diagnosed alcohol dependence and determined a GAF of 65.[5] AR 145.

**Feder's RFC assessment.** Medical consultant R.J. Feder assessed Plaintiff's residual functional capacity on March 23, 2007. AR 147-151. In his opinion, Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; could stand, walk, or sit for six hours in an eight-hour workday; had unlimited ability to push or pull; and had no other limitations. AR 143-150.

**Garcia's psychiatric assessment.** On July 23, 2007, using information in the record, psychiatrist Archimedes Garcia assessed Plaintiff, reporting a substance addiction disorder that was not severe. AR 259-264.

**Plaintiff's RFC testimony.** Plaintiff testified that she was unable to move her neck from side to side, describing it as "stiff" and "like it gets stuck." AR 327. When she has neck pain, she cannot move her neck from front to back. AR 328. If she bends her neck, she has severe pain. AR 330-331. Nothing she can do will cause her neck to get worse other than moving. AR 328. She has to lie a specific way, supported by pillows, so that her neck does not cramp when she watches television. AR 331. Plaintiff stopped wearing her neck brace against doctor's orders because it made her feel uncomfortable. AR 329-330.

The neck pain gives her migraines and makes her see stars. AR 328. The migraine pain lasts an hour until she takes all her pain drugs, vicodin, tramadol, and the pink pills at the same

///

---

[5] GAF 65 is in the middle of the range 61-70, which indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM IV TR at 34.

time. AR 328. Plaintiff no longer gets the headaches as frequently as she did before her neck began to heal. AR 329.

Plaintiff can stand or sit in a chair for about one-half hour before her right leg goes to sleep. AR 332. Her right leg also goes to sleep when she walks. AR 332. Her leg goes to sleep two or three times each day for an hour or two. AR 334. She can walk about a block. AR 332. She can lift fifteen to twenty pounds without causing pain. AR 332-333.

Plaintiff cooked three meals a day, with her ten-year-old grandson's help.[6] AR 334-335. Her grandson also helped her clean: he did the chairs, bathroom, and kitchen, and Plaintiff did the vacuuming. AR 334. Plaintiff did the laundry and the grocery shopping. AR 335. Plaintiff can vacuum or clean for three hours at a time. AR 336.

Because Plaintiff reclined twelve hours a day, she was unable to sleep at night. AR 336. At night, she watched television or listened to it with her eyes closed. AR 336. Plaintiff can concentrate for at least an hour, as measured by her concentration on her favorite television show, *The Young and the Restless*. AR 338. She thought that she could concentrate up to ninety minutes but not for two hours. AR 338-339. After ninety minutes, she would take her medicine and go back to sleep. AR 339.

Plaintiff is depressed, but her sad mood does not interfere with her ability to function. AR 337-338.

**Vocational expert's testimony.** Judith Nazarian testified as a vocational expert. AR 309. The ALJ directed her to assume an individual of the same age, educational background, and work history as Plaintiff. AR 342. For the first hypothetical, Nazarian was directed to assume an individual limited to the light exertional level; who can do no pushing, pulling, or reaching above shoulder level with her upper extremities, bilaterally; who is limited to simple, repetitive tasks; cannot do desk work or work with her head down for a prolonged period; and cannot repetitively rotate her head more than forty-five degrees in either direction. AR 342-344. Nazarian opined that such a person could be a goodwill ambassador, such as a Walmart greeter; a parking lot

---

[6] Plaintiff's grandson had lived with her for about three months, pending a custody hearing to determine whether his mother or father (Plaintiff's son) would have custody. AR 340.

9

attendant; a cafeteria attendant; or a vending machine attendant who was not required to reach above the shoulder level. AR 344-346. Such a person could not do Plaintiff's former laundry job, which is medium level work. AR 346.

Hypothetical question two makes the same assumptions except that pain limits the person's work activities to two hour increments at a time. AR 346. Nazarian opined that no such jobs existed. AR 346.

## II. Discussion

### A. Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

> Step one:   Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
>
> Step two:   Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
>
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
>
> Step four:  Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

///

///

| | | |
|---|---|---|
|Step five:|Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.||

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since January 5, 2007.  AR 17.  Plaintiff had two severe impairments: multiple fractures and degenerative disc disease of the cervical spine.  AR 17.  Her impairment did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpt. P. Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926).  AR 18.  Plaintiff could not perform any prior relevant work.  AR 120.  She had the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently, and to sit, stand, and walk for six hours of an eight hour day, with no pushing or pulling with the upper extremities above the shoulder level bilaterally, no downward head position for prolonged periods, or head rotation greater than forty-five degrees in either direction on a repetitive basis.  AR 18.  She could perform simple repetitive tasks as defined in 20 C.F.R. § 416.967(b).  AR 18.  After considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that jobs that Plaintiff could perform existed in the national economy in significant numbers.  AR 21.

**B.     Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's

11

determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987). The scope of review requires this Court to consider the record as a whole, examining both the evidence supporting the ALJ's decision and the evidence that does not.

### C.   Failure to Adopt Treating Physicians' Opinions

Plaintiff raises a single contention: that the ALJ erred by failing to give proper weight to the opinion of Plaintiff's treating physician, Dr. Stefanescu. In a medical evaluation dated February 13, 2007, Stefanescu found Plaintiff's condition to be unremarkable except for a limited range of motion resulting from her cervical fracture. AR 133-134. Because of the cervical fracture, Stefanescu opined that Plaintiff could frequently lift twenty-five pounds and occasionally lift ten pounds [*sic*], could stand or walk less than two hours in an eight-hour work day, could sit six hours in an eight hour workday, needed to alternate sitting and standing, and could never climb, balance, stoop, kneel, crouch, or crawl. AR 136. Plaintiff could not work near heights or moving machinery. AR 136. According to Stefanescu, Plaintiff's prognosis was a "long recovery of [cervical] fracture after surgery." AR 136.

The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion. 28 C.F.R. § 404.1527(d). Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830.

A treating physician's opinion is generally entitled to more weight that the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id.* The Social Security

Administration favors the opinion of a treating physician over that of nontreating physicians. 20 C.F.R. § 404.1527; *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).

This Court's task is not to re-weigh the evidence but to determine whether the ALJ's determination is supported by substantial evidence and free of legal error. The Court must review the ALJ's express reason(s) for declining to adopt a doctor's opinion and determine whether the rejection was specific and legitimate.

Having failed to identify that Stefanescu prepared the report in question,[7] the ALJ discounted it in the course of a three-sentence paragraph as "not supportable by the objective medical evidence or clinical findings." AR 20. Although the ALJ erred both by failing to exert sufficient effort to identify the report's author and by failing to discuss the report of a treating physician, Stefanescu's report is so perfunctory and unsupportable that the error is harmless.

**Supportability.** Stefanescu's opinion is not supportable under 20 C.F.R. § 404.1527(d)(3), which provides, in pertinent part:

> The more a medical source presents relevant evidence to support an opinion, particularly signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.

Stefanescu's opinion consists of mainly of checked responses to a series of questions. Responses to many questions are incomplete or missing. The form was carelessly completed (e.g., Stefanescu opines that Plaintiff can lift 25 pounds frequently and ten pounds occasionally). Beyond identifying that Plaintiff had a cervical fracture with a long recovery period, Stefanescu provides no explanation for the limitations he has checked. In addition, because the report was signed about six weeks after Plaintiff was injured, the report fails to articulate whether any or all of the limitations apply solely for the anticipated recovery period.

///

---

[7] The ALJ found Stefanescu's signature illegible. AR 20. Although Stefanescu's handwriting is unusual, this Court finds it to be legible with reasonable effort.

13

**Context of Stefanescu's opinion.** Finally, the ALJ's application of Stefanescu's opinion must be considered in the context of her decision as a whole. Plaintiff does not challenge the ALJ's finding that Plaintiff's testimony of her own condition and activities undermined Plaintiff's disability claims. Substantial evidence amply supports the ALJ's denial of disability benefits: the medical records did not support Plaintiff's claims, and Plaintiff's testimony regarding her disability was simply not credible.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn*, 495 F.3d at 635, *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). But if he or she decides to reject a claimant's pain testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533

F.3d 1035, 1039 (9th Cir. 2008), *citing Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision.  *Thomas*, 278 F.3d at 959.

For example, in addition to finding Mrs. Thomas's medical records did not support the level of pain and the limitations to which she testified, the ALJ in *Thomas* found that Thomas had an "extremely poor work history," "little propensity to work in her lifetime," and a sporadic work history periodically interrupted by years of unemployment.  *Id.* Thomas, who had worked as a bartender, house cleaner and concession worker, remained able to perform her own housework, including cooking, laundry, washing dishes, and shopping.  *Id.*  Her testimony about her drug and alcohol usage was internally inconsistent and lacked candor.  *Id.*  And, most compelling, Thomas impeded testing during two physical capacity evaluations, demonstrating "self-limiting behavior" that embodied inconsistent and minimal effort.  *Id.*  The record of Plaintiff's application bears an uncanny similarity to that of Mrs. Thomas.

The Ninth Circuit has summarized the applicable standard:

[T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'"  *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive."  *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing."  *Id.*  Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules.  *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand).  Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment."  *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

An ALJ may find the claimant's testimony not credible by making specific findings of credibility and supporting each such finding with clear and convincing evidence.  *Robbins*, 466

F.3d at 883.  The ALJ did so here, pointing out that the claimed disability was unsupported by medical evidence and Plaintiff's own testimony.

At the time of the hearing, Plaintiff cared for and supervised a ten-year-old child.  She was able to shop for three hours at a time, cook, and clean.  She did laundry and operated a vacuum cleaner.  Plaintiff testified that she was able to clean and vacuum for three hours at a time and that she could lift up to twenty pounds without pain.

Plaintiff's condition had improved substantially since the period of time immediately following her injury.  Plaintiff stopped wearing her neck brace because it felt uncomfortable.  Her headaches had become less frequent.  She never received physical therapy, pain injections, or long-term pain treatment such as biofeedback, acupuncture, or use of a TENS unit.  She frequently missed medical appointments.  Her treating doctors questioned her requests for narcotic pain relievers, ultimately forbidding further prescriptions for narcotics and referring her to a pain management center.  After a single visit, Plaintiff refused to return for further pain management, contending that the physician had suggested that she might be an alcoholic.  In short, the ALJ's determination was supported by substantial evidence.

**III.      Conclusion and Order**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

**Dated:     November 2, 2010**               /s/ Sandra M. Snyder
                                      UNITED STATES MAGISTRATE JUDGE